**NOBLE CO., Plaintiff-Appellee,**

v.

**The C. S. JOHNSON COMPANY,
Defendant-Appellant.**

**No. 11814.**

United States Court of Appeals
Seventh Circuit.

Feb. 15, 1957.

470

Richard Russell Wolfe, Jarrett Ross Clark, Chicago, Ill., Meyer & Capel Champaign, Ill., for appellant, Carlson, Pitzner, Hubbard & Wolfe, Chicago, Ill., William A. Denny, Milwaukee, Wis., of counsel.

A. Donham Owen, San Francisco, Cal., Edmund C. Rogers, St. Louis, Mo., for appellee.

Before DUFFY, Chief Judge, and SWAIM and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Defendant, herein referred to as Johnson Company, has appealed from a judg-

ment of the district court, following a trial on defendant's counterclaim and the reply thereto of plaintiff, herein referred to as Noble Co.[1] The court having filed 41 findings of fact and 18 conclusions of law, its judgment declared invalid United States patent 2,109,534, as to claim 31, and United States patent 2,199,289, as to claim 2,[2] and dismissed the counterclaim for infringement thereof. The district court found that neither patent is valid and that the improvements, if any, in said patents over prior art were not beyond mechanical skill and do not reach the status of invention.

Both parties manufacture and sell plants for making concrete. It is with such plants that this case is concerned. The 2199 patent deals with a central mixing plant, while the 2109 patent relates to a batching device with mix selection.[3]

In the record before us there are over 450 pages of oral testimony, in addition to much documentary evidence.

1. We feel that rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., applies to this case. The rule [4] requires that an appellate court make allowance for the advantages possessed by the trial court in appraising the significance of conflicting testimony and reverse only clearly erroneous findings of fact.

As to 2199:

Finding 3 of the district court follows:

"3. In Johnson patent No. 2199, application was filed February 6,

1935 and issued April 30, 1940. It is termed a 'Central Mixing Plant', sometimes characterized also as a 'Vertical Flow Plant'. There are storage bins for sand, cement, and several sizes of gravel located at the top of the plant. The materials are lifted or dumped into these various bins. Under each bin is a weighing device called a batcher. The materials from the bins are permitted to flow into the batchers by opening and closing of a gate. Below the batchers is a hopper to collect the various materials making up the mix or aggregate. A suitable chute is provided below the hopper to convey the aggregate into one or more of the mixers which are arranged below the hopper. The mixers have a single end opening, charging and discharging at the center axis of the plant. A receiver is provided below the mixers to receive the mixed concrete from the various mixers. The flow of gravity operates the plant."

Claim 2 reads:

"In a central mixing plant, a plurality of mixers having charging openings, said mixers being disposed with their charging openings directed towards a common center, and said mixers being further adapted to discharge towards the aforesaid common center, an aggregate collecting hopper supported at an elevation above said mixers, a movable distributing chute leading from said aggregate collecting hopper and adjustable about a vertical

---

1. This litigation started with a complaint filed by Noble Co., praying for a declaration of invalidity and non-infringement as to six patents owned by Johnson Company, assignee of Charles S. Johnson, patentee, and seeking damages for unfair competition. Before trial, the complaint was dismissed without prejudice as to the charge of unfair competition and as to the charges of infringement on four of the patents, because Johnson Company "does not claim infringement" thereof.

2. Out of a total of 34 claims involved in

2109 and 6 claims involved in 2199, Johnson Company, in the district court, limited its charges of infringement to claim 31 in 2109 and claim 2 in 2199.

3. 2,199,289 expires April 30, 1957 and 2,-109,534 expired March 1, 1955.

4. 28 U.S.C.A. rule 52(a), which reads in part:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

axis passing substantially through the common center aforesaid to direct aggregates from the hopper to any selected one of the mixers, and a mixed concrete receiver common to all of the mixers and disposed below the mixers, the said receiver being open at its upper end and extending laterally about a vertical axis passing through the aforesaid common center so as to be capable of selectively receiving mixed concrete from the mixers."

Finding 5 follows:

"5. This claim, specification and evidence disclose that the elements upon which No. 2199 is to stand for invention and validity as a patent are:

"1. A plurality of single ended mixers with their charge-discharge openings all pointed toward the center of the plant.

"2. An aggregate collecting hopper above the mixers.

"3. A distributing chute below the aggregate hopper movable to feed the aggregate into any one of the mixers.

"4. A receiver below the mixers, of a shape to receive concrete from all the mixers."

This plant is known in the art as a vertical flow plant because the aggregates flow by gravity from top to bottom.

The district court found, in finding 6, that the prior art in evidence discloses that each of the foregoing elements is old, citing, in finding 7, that tilting mixers, which were charged and discharged from one end, were disclosed in Brown patent, No. 1,314,124, August 26, 1919; Piispanen patent, No. 1,780,940, November 11, 1930; A. G. Reed patent, No. 1,848,223, March 8, 1932, and in the Waterlip reference in "Pit & Quarry" publication dated March 26, 1930; citing in finding 9, that aggregate collecting hoppers were disclosed in the Herbert plant in 1931 and the Madden Dam plant; and citing in finding 8, that a

movable distributing chute was disclosed in W. Watson patent, No. 282,425, and in the Herbert plant built by Johnson in 1931 and the Madden Dam plant which was sold and planned by Johnson in 1932, and in Bolz patent, No. 997,742 dated July 11, 1911; and citing, in finding 10, that a mixed concrete receiver such as described in 2199 is disclosed in the Madden Dam plant and the Waterlip plant as shown in "Pit & Quarry" publication of March 26, 1930.

Thereupon, in finding 12, the district court found that the prior art anticipates patent 2199.

The district court in findings 13 through 17 proceeded to analyze the prior art as to the functioning of the various elements used therein and the results obtained thereby. Thus, in finding 13, the court found that the "vertical flow plant", such as appears in 2199, is shown in a catalog published in 1931 by the Stephens-Adamson Mfg. Co. There, drawings for a concrete making plant show overhead bins for different materials, which were filled by a conveyor, batchers, receiving hopper and a chute below the hopper to convey the aggregates into a mixer. Finding 14 revealed that a distributing chute and a flopgate were utilized in the Waterlip plant. This apparatus was located under an aggregate hopper and permitted the aggregates to be placed in either of two mixers, which were charged and discharged from one end and were tilted into a common receiving hopper for discharge. Finding 15 pointed out that the height of the bins was lowered in the Herbert plant, with reduced expense in elevating materials to the bins, and that this was also present in the Waterlip and Stephens-Adamson plants. Finding 16 found that, insofar as the use in 2199 of a short chute charging a mixer meant better premixing and less mixing time, this was also achieved in the Herbert and Waterlip plants. Finding 17, in effect, found that the Madden plant, by substituting single-end mixers, could also achieve a short direct chuting from the aggregate collecting

hoppers into the mixers with only a mechanical change. The district court concluded in findings 18 and 19 that there was no invention and that the functions of "the old elements are the same in 2199 as in the prior art and no new results are obtained by their association."

As to 2109:

The district court found, in finding 20:

"20. The Johnson patent No. 2109 issued March 1, 1938, on an application filed June 27, 1935. Here again we have a 'central mixing plant' which 'deals primarily with problems arising in the construction of such plants when designed for the mixing of huge quantities of concrete such as may be employed in the building of large dams and similar artificial masonry projects.' The patent describes means for the control of the proportions or relative weights of the different aggregates that are to make up the particular batches."

Claim 31 reads:

"In a materials proportioning plant, in combination, supply means for different aggregates, proportioning devices for receiving each one of said aggregates from the supply means, a plurality of measuring instrumentalities for each proportioning device, and a common control for said measuring instrumentalities for rendering one of said measuring instrumentalities for each proportioning device operative for measuring a predetermined quantity of materials handled by each proportioning device."

In findings 22 and 23, the court said:

"22. Johnson, in his specifications shows that he utilized beam scales instead of dial scales, which were interchangeable in the art according to the evidence, with a separate scale under each batcher. To shorten this description reference will be made to the scales for the sand, cement, and gravel. Each of these scales had a main beam at the top with a ladder hanging from it onto which any one or more of several ingredient beams could be lowered. Each of the ingredient beams is held off the ladder, and hence, free from the main beam, by a small hydraulic ram plunger. If any plunger is withdrawn, its beam is lowered onto the ladder. Johnson connected all of the number one beam rams together, all of the number 2 beam rams together, and all of the number 3 beam rams together. These several connections were then brought down to a single hydraulic valve that controlled the inlet of hydraulic pressure. The valve could be moved to place in use the number one beam rams, the number 2 beam rams, or the number 3 beam rams by being moved to one of the three positions at the control stand as shown in Figure 7, Sheet 5 of the patent. The poises on the various ingredient beams could be pre-set so that one operator could select the desired mix.

"23. In 2109, we find four elements in a materials proportioning plant, in combination, which is not limited to the size of the plant:

"1. Supply bins;

"2. Individual batchers, one for each bin;

"3. A multiple beam scale for each batcher; and

"4. A common control for placing a selected beam of each multi-beam scale into operation."

Having found, in finding 24, that the first three elements were old in the art, the court became specific in that respect in the following findings:

"25. The supply means for different aggregates is found in the Hoover Dam plant, Herbert plant 1931, J. F. Robb, No. 1,750,244, March 11, 1930, and R. E. Robb,

No. 2,044,017, application filed June 28, 1929, and patent issued June 16, 1936.

"26. The individual batchers are also shown in J. F. Robb and R. E. Robb.

"27. Multiple beam scales are found in the Davis patent, No. 37,-569, February 3, 1863. Gagnon patent, No. 854,285, May 21, 1907, also used multiple beam scales.

"28. J. F. Robb had individual weighing and mix selection or regulation through variability of beam scale counterweights.

"29. The Hoover Dam plant had individual (simultaneous) weighing with mix selection on beam scales by manual adjustment of the poises.

"30. The Madden Dam plant had individual (simultaneous) weighing with mix selection on dial scales by multiple adjustable indexes or pointers on each scale rim.

"31. General Electric as shown in publication of 'Rock Products' dated September 26, 1931, and Stephens-Adamson in 1931, had scale rim indexes with lights plus photoelectric devices to make the weighing automatic.

"32. No novelty for invention in No. 2109 is found in the common control and simultaneous weighing or batching instead of sequential weighing.

"33. Venable patent, No. 1,982,-127, application filed November 27, 1931, issued November 27, 1934, taught simultaneous weighing as well as sequential weighing as being interchangeable, but suggested it was more economical 'especially where plurality of kinds of material have to be included in each batch' to use the simultaneous method. The Hoover Dam also utilized simultaneous weighing.

"34. Madsen patent, No. 2,038,-746, application filed August 24, 1931, issued April 28, 1936 had bins, batchers on weighing devices, multiple pre-set scales, and a common control. The batch selector control handle permitted the operator to select different quantities of the various ingredients to form the type of mix to be used. Madsen used the dial scales with pre-set contacts on the dial which were connected electrically to cause the opening and closing of the bin gates. However, Madsen taught the use of sequential and not simultaneous weighing. By connecting the four Madsen rings, one for each ingredient, Madsen would be the equivalent to a four scale plant as in 2109, and give simultaneous weighing with the common control. This would require only mechanical skill.

"35. In H. A. Essman patent, No. 1,624,588, April 12, 1927, there is a control wheel which would operate different levers and place one or more different weights on a beam scale. In this manner 15 batches of various ingredients could be made at one time.

"36. N. Newman patent, No. 741,975, October 20, 1903, portrayed automatic electric weighing devices. However, it was designed to weigh staples such as coffee, sugar, peas, beans, etc. It had automatic shutoff on the gates although it did not open and close the gates to weigh accurately by today's standards of weighing such staples.

"37. At Hoover Dam there was automatic weighing of the ingredients in separate batchers which dropped the material onto a belt where it was conveyed to a collecting hopper, which permitted chuting into the mixers. Hoover had simultaneous batching from a central control point, but utilized a single beam for weighing each material. If the Davis patent No. 37,569 which utilized several scale beams was combined with Hoover we would have a multibeam scale as we have in 2109. One skilled in the art would make only a mechanical

change to adopt the multibeam scales into the Hoover mechanism.

"38. Norris Dam anticipated the broad claim in 2109. 'By means of the control board, five different concrete mixes could be produced without resetting the weigh-batcher scale indicators. Five sets of pointer lights on weigh-batcher scale dials operated from the control board made rapid mix selections possible.' Norris had supply means, proportioning devices, plurality of measuring instrumentalities and a common control, all as described by claim 31. Since dial scales and beam scales were used interchangeably in the art Norris Dam anticipated 2109.

"39. The Johnson Company in February 1934 made a construction bid to build the Norris Dam plant, which included the aforedescribed batch-selecting system, and that plant was actually built and was placed in operation by July 17, 1934, about a year prior to the filing date of the Johnson 2109 patent.

"The Johnson Company did not overcome the prior dates of the Norris Dam batch-selecting system, since

"(a) The Johnson Company did not carry the dates of alleged invention of the 2109 patent back of its filing date in June 1935; and

"(b) Did not prove that the batch-selection system in the Norris Dam plant was originated by C. S. Johnson personally, as distinguished from others at the C. S. Johnson Company; and

"(c) Did not prove that C. S. Johnson personally originated the 2109 system prior to the date when the Norris Dam plant batch-selecting system was known and used by others, including those of the C. S. Johnson Company."

In finding 40, the court found that neither 2109 nor 2199 "is valid" and, in finding 41, that the improvements, if any, in Johnson's patents over the prior art were not beyond mechanical skill and do not reach the status of invention.

In conclusions of law 15 and 16, the court said that claim 31 of 2109 and claim 2 of 2199 are invalid for anticipation and for lack of invention.

■ On a trial of a patent case without a jury, the district court has the initial duty of determining the evidentiary facts.[5] Where they are in dispute and there is a conflict in the testimony of witnesses in regard thereto or a dispute as to the reasonable inferences to be drawn from the evidence, the district court's findings of fact will not be set aside unless clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.[6]

■ The next step is a finding by the district court of the ultimate facts, such as invention and anticipation. While it has been said[7] that such finding of fact is on appeal entitled to such consideration as is provided for in rule 52(a), it has been held that the court, in making such finding, is required to apply the correct criteria of law to the evidentiary facts, and whether it has done so is reviewable on appeal as a matter of law. Great A. & P. Tea Co. v.

5. " * * * evidentiary facts are to be found from the testimony and other evidence. Ultimate facts are reasoned conclusions drawn from the evidentiary facts thus found. They are, however, likewise fact findings." Commissioner of Internal Revenue v. Sharp, 3 Cir., 91 F.2d 804, 805.

6. Gaytime Frock Co. v. Liberty Mutual Ins. Co., 7 Cir., 148 F.2d 694, 696; Central Ry. Signal Co. v. Longden, 7 Cir., 194 F.2d 310, 317.

7. Anderson v. Phoenix Products Co., 7 Cir., 226 F.2d 191, 193; Continental Farm Equipment Co. v. Love Tractor, 8 Cir., 199 F.2d 202, 204; White v. E. L. Bruce Co., 3 Cir., 162 F.2d 304, 305; National Aluminate Corp. v. Permutit Co., 8 Cir., 145 F.2d 175, 178 and Hazeltine Corp. v. General Motors Corp., 3 Cir., 131 F.2d 34, 37.

Supermarket Equip. Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162.

When the district court has thus found the ultimate facts, it is then its duty to decide, as a matter of law, the over-all question of validity, which, of course, is likewise subject to review. In this connection it should be noted that invention does not connote patentability. Galland-Henning Co. v. Logemann Bros. Co., 7 Cir., 142 F.2d 700, 703, certiorari denied 323 U.S. 767, 65 S.Ct. 120, 89 L.Ed. 614, and Harley C. Loney Co. v. Ravenscroft, 7 Cir., 162 F.2d 703, 704.

The record herein shows that the district court had before it, not only the conflicting testimony of witnesses in open court, but a vast amount of documentary evidence. We have carefully examined all of this evidence. We now determine (1) that the findings of fact made in the court below are not clearly erroneous and are supported by substantial evidence, and (2) that, in finding the ultimate facts, that court applied the correct criteria of law to the evidentiary facts.

2. In reaching the foregoing result, we have excluded finding 40, which, in effect, found the patents invalid, because, in our opinion, this involves a question of law rather than one of fact. Graver Tank & Mfg. Co. v. Linde Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672, and Great A. & P. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 71 S. Ct. 127.

In the Graver case, the district court held, *inter alia*, that four claims [8] there involved were valid, and in that respect we affirmed.[8a] Speaking of these claims, the Supreme Court said, 336 U.S. at page 274, 69 S.Ct. at page 537, that it was

" * * * asked to hold that there has been no such invention.

"Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides in part: 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' To no type of case in this last clause more appropriately applicable than to the one before us, where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations. * * * He wrote a careful and succinct opinion and made findings covering all the *factual* issues.

"The rule requires that an appellate court make allowance for the advantages possessed by the trial court in appraising the significance of conflicting testimony and reverse only 'clearly erroneous' findings. These are manifestly supported by substantial evidence and the Court of Appeals found them supported by the weight of the evidence—indeed found the evidence to warrant support of the patent even in matters not found by the trial court. A court of law, such as this Court is, rather than a court for correction of errors in fact finding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error. * * *

"No such showing is made. While the ultimate question of patentability is one of meeting the requirements of the statute, R.S. § 4886, as amended, 35 U.S.C. § 31, 35 U.S.C.A. § 31, *the facts as found* with respect to these four flux claims *warrant a conclusion here that as a matter of law those statutory requirements have been met.* Accordingly, we affirm the judgment *insofar as it holds claims numbered 18, 20, 22 and 23 define an invention for which patent has validly issued.*" (Italics supplied.)

In the Great A. & P. Tea Co. case, 340 U.S. at page 149, 71 S.Ct. at page 128

8. Known as flux claims 18, 20, 22 and 23.

8a. 7 Cir., 167 F.2d 531, 539.

after pointing out that the district court found that each element in the device before the court was known to prior art, the Supreme Court said that the district court found: "However, * * * the conception of a counter with an extension to receive a bottomless self-unloading tray with which to push the contents of the tray in front of the cashier was a decidedly novel feature and constitutes a new and useful combination.'" The Supreme Court then said that the court of appeals regarded this finding of invention as one of fact, sustained by substantial evidence, and affirmed it as not clearly erroneous, and that, failing to identify any other new or different element to constitute invention, it overcame its doubts by consideration of the need for some such device and evidence of commercial success of this one. The Supreme Court then said,—"Since the courts below perceived invention only in an extension of the counter, we must first determine whether they were right in so doing. We think not." The court added, 340 U.S. at page 153, 71 S.Ct. at page 130:

"* * * To bring these devices together and apply them to save the time of customer and checker was a good idea, but scores of progressive ideas in business are not patentable, and *we conclude on the findings below that this one was not.*

"It is urged, however, that concurrence of two courts below, in holding the patent claims valid, concludes this Court. * * *" (Italics supplied.)

After quoting from the Graver case, the court added:

"* * * We set aside no finding of fact as to invention, for none has been made except as to the extension of the counter, which cannot stand as *a matter of law.* The defect that we find in this judgment is that a standard of invention appears to have been used that is less exacting than that required where a combination is made up entirely of old components. It is on this ground that the judgment below is reversed." (Italics supplied.)

The concurring opinion, 340 U.S. at page 155, 71 S.Ct. at page 132, stated in part: "The standard of patentability is a constitutional standard; and the question of validity of a patent is a question of law".[9]

3. We now proceed to test the correctness of the district court's conclusions of law invalidating claim 31 of 2109 and claim 2 of 2199.

Noble takes the position that a claim is invalid for lack of invention where it comprises a mere "congregation" of a number of old parts which, in the "congregation", perform no new or different function than that theretofore performed by them. It relies on Great A. & P. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130 where the court said:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in

---

9. We are aware of a conflict of opinion among the courts of appeals on the question of whether validity is a question of fact or a question of law. Prior to the A. & P. Tea Co. and Graver cases, we stated that validity is a question of law. Harley C. Loney Co. v. Ravenscroft, 7 Cir., 162 F.2d 703, 704; and National Slug Rejectors v. A. B. T., 7 Cir., 164 F.2d 333, 336. Thereafter we considered validity to be a question of fact. Hazeltine Research v. Admiral Corp., 7 Cir., 183 F.2d 953, 955; Kraft v. Walther, 7 Cir., 234 F.2d 279, 281–282; Weller v. Wen Products Inc., 7 Cir., 231 F.2d

795, 797; Wilson v. Seng Co., 7 Cir., 194 F.2d 399, 402, and other cases.

Other courts of appeal have held that the question of validity is one of law, citing the A. & P. Tea Co. case. Blish, etc. v. Time Saver Tools, 10 Cir., 236 F.2d 913, 916; Steffan v. Weber Heating, 8 Cir., 237 F.2d 601, 602; Fritz W. Glitsch & Sons v. Wyatt, 5 Cir., 224 F.2d 331, 335.

Compare Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794, 802; Porter-Cable Machine Co. v. Knives & Saws, 7 Cir., 204 F.2d 21, 23; and Standard Oil Development Co. v. Marzall, 86 U.S.App. D.C. 210, 181 F.2d 280, 283.

an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to substract from former resources freely available to skilled artisans."

and in 340 U.S. at page 151, 71 S.Ct. at page 130 where the court quoted Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008:

"'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.'"

On the other hand, Johnson Company relies, *inter alia*, on Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 43 S.Ct. 322, 324, 67 L.Ed. 523, which, it says, held that invention was present even though the change in the existing machine was a *mechanical one.* Johnson Company maintains that the district court clearly erred in predicating lack of invention here on the premise that a "mechanical change" cannot distinguish an inventive concept over the prior art.

However, the Eibel case is valuable here, not in support of Johnson Company, but because it relates to an improvement on an old machine which was held to constitute invention. Eibel's improvement on a papermaking machine involved a substantial elevation of the breast-roll end of the moving screen or "paper-making wire", by which the liquid stock discharged upon the screen acquires through gravity an additional speed, enabling it to keep pace with the screen at the critical paper-forming point, thus avoiding injurious disturbances of the stock when the screen moves very rapidly, and making possible a much speedier production of good paper than was theretofore obtained from the machine without the improvement. The Eibel case held that a comparatively slight pitch of the screen in the prior art, but for another and distinct purpose, did not constitute anticipation. At page 66 of 261 U.S., at page 329 of 43 S.Ct. the court said:

"It is next objected that the alleged invention covers only a matter of degree in pitch, which can not be the subject of a patent. The prior art showed the application of gravity by use of the pitch of the wire to the improvement of the Fourdrinier machine, and Eibel, it is said, merely increased degree of pitch and gravity for the same general purpose. We think this attack upon the patent can not prevail. *Eibel's high or substantial pitch was directed toward a wholly different object from that of the prior art.* He was seeking thereby to remove the disturbance and ripples in the formation of the stock about 10 feet from the discharge, while the slight pitches of the prior art were planned to overcome the dryness in the formed web of the stock at double the distance from the discharge. * * * But, however this may be, the object of the one was entirely different from that of the other. * * *" (Italics supplied.)

To the same effect are Filtex Corporation v. Amen Atiyeh, 9 Cir., 216 F.2d 443, 445; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433, 436; and many other cases.

On the other hand, in the A. & P. Tea Co. case, 340 U.S. at page 152, 71 S.Ct. at page 130, the court said:

"Neither court below has made any finding that old elements which made up this device perform any additional or different function in the combination than they perform out of it. This counter does what a store counter always has done—it supports merchandise at a convenient height while the customer makes his purchases and the merchant his sales. The three-sided rack will draw or push goods put within it from one place to another—just what any such a rack would do on any smooth surface—and the guide rails keep it from falling or sliding

off from the counter, as guide rails have ever done. Two and two have been added together, and still they make only four. \* \* \*"

As to claim 31 in 2109, the patentee, to attain a type of mix selector, adds to old elements an improvement not beyond the mere work of a mechanic skilled in the art. This is done by providing a common control which renders operative one of the measuring instrumentalities for each proportioning device. This is a mechanical change operating upon an old combination. It relies upon no new concept or force. It is not invention. All of the other elements used in 2109 were anticipated by the prior art.

As to claim 2 in 2199, the results attributed by Johnson Company to its mixing plant are: reduced height of plant by elimination of the long, outside chuting as in Madden, reduced cost of building the lower plant, reduced cost of operating the plant because the materials do not have to be elevated as high in a lower plant, reduced time of operation because the materials fall a shorter distance from the batchers into the mixers in the lower plant, and a matter of "premixing". In its opinion, the district court concluded "after an examination of these old elements that patent 2199 is invalid because the functions of the four old elements are the same as in the prior art and no new results are obtained by their association".

From what we have hereinbefore set forth it is determined that the district court's conclusions of law are correct.

We may concede that the functions performed by Johnson's combinations were new and useful, but that does not necessarily make the devices patentable. They must not only be new and useful; they must also be an invention or discovery. Since Hotchkiss v. Greenwood, 11 How. 248, 267, 13 L.Ed. 683, 691, was decided over a century ago, it has been recognized that, if an improvement is to obtain the privileged position of a patent, more ingenuity must be involved than the work of a mechanic skilled in the art. Cuno Eng. Corp. v. Automatic Devices Corp., 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58. Johnson's results in the two patents here involved could have been achieved by any mechanic skilled in the art. They lacked "that impalpable something which distinguishes invention from simple mechanical skill". McClain v. Ortmayer, 141 U.S. 419, 427, 12 S.Ct. 76, 35 L.Ed. 800, 803.

4. Finally, Johnson Company contends that the district court, in showing the state of the art, erred as a matter of law in relying on the following patents: 2,044,017, issued June 13, 1936 to R. E. Robb on application filed June 28, 1929 (finding of fact 25), and 2,038,-746, issued April 28, 1936 to Madsen on application filed August 24, 1931 (finding of fact 34). It points out that these patents *issued* subsequently to June 27, 1935, the filing date of Johnson's application for patent 2109. However, the critical [10] date, as to R. E. Robb, is June 28, 1929 and as to Madsen, is August 24, 1931, when the respective applications were filed.

The district court found [11] that the supply means for different aggregates

---

10. Part II, 35 U.S.C.A. § 102 provides:

"A person shall be entitled to a patent unless—(a) the invention was known or used by others in this country \* \* \* before the invention thereof by the applicant for patent or \* \* \*(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, \* \* \*."

Part II, 35 U.S.C.A. § 103 reads:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102

of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

Part III, 35 U.S.C.A. § 282 provides:

"The following shall be defenses \* \*; (2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability, \* \* \*."

11. In finding 25.

was present in the Hoover Dam plant (1932) and the Herbert plant (1931), as well as J. F. Robb's patent 1,750,244 whose application predated June 27, 1935. Because Noble, in its brief, gives to R. E. Robb's 2,044,017 only faint support in a short footnote, we discard it as to finding 25. Without it, that finding has ample support in the other art cited. The district court also found [12] that, although Madsen taught the use of sequential and not simultaneous weighing, only mechanical skill was required to give simultaneous weighing with a common control.

We conclude that Johnson Company's contention in these respects is not sound.

5. As to the claims in suit, we hold that both patents 2109 and 2199 constitute aggregations from the prior art which in the aggregations perform no new or different function or operation than that theretofore performed or produced by them.

For these reasons the judgment of the district court is affirmed.

Judgment affirmed.