**HOOVER COMPANY, Plaintiff-Appellant,**

v.

**MITCHELL MANUFACTURING COMPANY, Defendant-Appellee.**

**No. 12526.**

United States Court of Appeals
Seventh Circuit.

July 28, 1959.

796

Albert H. Pendleton, Stuart S. Ball, Gregory B. Beggs, Chicago, Ill., Richard R. Fitzsimmons, North Canton, Ohio, for appellant, Olson, Mecklenburger, von Holst, Pendleton & Neuman, Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel.

Max R. Kraus, Casper W. Ooms, Robert C. Williams, Robert L. Kahn, Chicago, Ill., for appellee.

Before MAJOR, SCHNACKENBERG and PARKINSON, Circuit Judges.

MAJOR, Circuit Judge.

This is a suit charging infringement of Babcock Patent No. 2,391,859. The defenses of invalidity and non-infringement were interposed. The district court, predicated upon and consistent with its findings of fact, decided both issues adversely to plaintiff. Thereupon, the court, on September 9, 1958, entered

an order dismissing the complaint. From this order plaintiff appeals.

Plaintiff is a corporation of the State of Ohio, having its principal place of business at North Canton, Ohio. Defendant is a corporation of the State of Delaware. The alleged acts of infringement were committed within the Northern District of Illinois, Eastern Division, where the defendant had a regular and established place of business.

The patent in suit issued January 1, 1946, in the name of Earl Babcock as inventor, on an application described as a division of an application filed November 7, 1931. The instant action was commenced November 7, 1950, at which time plaintiff was the sole and exclusive owner of the patent, with all rights flowing therefrom. The patent is entitled, "Room Cooling Device," and issued with a total of thirty-seven claims. Eleven of such claims were disclaimed prior to the institution of this action. Infringement was charged as to claims 10, 14, 24, 26, 29 and 30.

The parties, for the purpose of this case, stipulated:

"Earl Babcock, patentee of patent No. 2,391,859 in suit, conceived the subject matter of the said patent at least as early as August 26, 1931, made the drawing identified as Sheet No. 4936 * * * on August 26, 1931, and disclosed the said subject matter and drawing to others on August 26, 1931, proceeding immediately thereafter with the preparation of his original patent application Serial No. 573,564 and with the filing thereof in the United States Patent Office on November 7, 1931."

The patent in its drawings and specification, as related in plaintiff's brief, discloses a room air conditioner mounted on a window sill underneath the raised lower sash. There is located on the room side of the window an evaporator (cooling coil) with four fans for blowing air thereover and circulating it through the room. The evaporator, being the cooling coil of a refrigerating system, conditions the room air by cooling it. The refrigeration system is so designed and operated that the temperature of the evaporator is maintained somewhat above the freezing point of water. Consequently, a large part of the moisture content (humidity) in the room air is condensed in liquid form on the evaporator so that the air conditioning requirement of dehumidification is accomplished. The condensed moisture is collected in a drip pan and removed to the exterior of the building through a drain tube extending through the window opening inside the apparatus.

On the other side of the window (outside) are located other components of the refrigerating system. These include an electrically operated motor compressor and a condenser constituting the heat discharging portion of the system. Heat is dissipated from this part of the system by blowing outside air thereover by means of a fan.

The combination of structural elements includes a casing divided into two compartments or chambers by an insulating partition, and the heat absorbing and heat dissipating elements are respectively housed in these two compartments. The inner and outer portions of the casings serve to confine and guide the separate streams of air circulating therethrough so as to accomplish the respective air cooling and heat discharging functions. A fresh air duct extends through the partition and may be opened or closed by a damper. By this means a controllable amount of outside fresh air may be mixed with room air passing over the evaporator, so that both the fresh air and room air are cooled and dehumidified.

Plaintiff asserts that since the heat dissipating element (condenser) is cooled by outside air, no cooling water system is needed and, therefore, no water supply connections are required; that the provision for disposing of condensate from the evaporator through the interior of the unit to the outside of the building accomplishes this function without need

of providing any drain connections outside of the unit itself, and that the provision of the ventilating air intake, also inside the unit, avoids the necessity of providing auxiliary ventilating openings of any kind.

The result which plaintiff claims for the combination is a completely unitary, self-contained and portable air conditioner which may be installed and put into operation without any modification of the building structure. All that is required, so it is asserted, is the mounting of the unitary device on the window sill, closing the window opening around it and plugging a cord into an electrical outlet. No plumbing connections, air duct installation or other modifications of the building structure are involved in either installing and operating the apparatus or in removing it to another location.

The principal contested issues arise from defendant's contentions, advanced in the trial court and renewed here, (1) that the claims in suit are invalid for lack of invention over the prior art, and (2) that they are invalid as anticipated by the work of Ward Thorne. The trial court made findings and entered conclusions of law favorable to defendant on both issues. On the first issue, defendant argues that the prior art shows that a unitary refrigeration machine was old before Babcock and widely used in a number of different situations; window sills had been used innumerable times as mounting places for mechanical ventilating devices, and to combine the two was not inventive. On the second issue, defendant argues that Ward Thorne of Chicago, assisted by Vickers and witnessed by Walton and others, constructed several mechanical air conditioners, tested them for design by mounting them in a window opening in a test room and decided to manufacture them on a commercial scale. Defendant contends, and the trial court found, that Thorne's work antedates Babcock's date of conception (August 26, 1931) and invalidates Babcock's patent. Other issues are argued, largely subsidiary to the two principal issues, which need not be set forth at this point.

Some general observations, relating in the main to the state of the art at the time of Babcock's invention, appear to be in order. These in abbreviated form we take from the undisputed findings of the district court. The patent states that air conditioning units had previously "been proposed which are suitable for use in a room and which employ a refrigerating apparatus to cool the room air." Mechanical refrigeration was a fairly well developed art before the decade preceding the filing of the Babcock patent application. There was also a gas absorption system. Both of these systems comprised a "hot side" where heat was released to the surrounding atmosphere and a "cold side" where heat was extracted from the surrounding air. Both were in use in domestic refrigeration, including air conditioning, long before the date of Babcock's conception.

The evaporator in any refrigeration system, if exposed to air or ordinary humidity at room temperatures, will necessarily condense moisture from the surrounding air upon the evaporator, just as a pitcher of ice water will do in a warm room. One of the features to which Babcock lays claim in his patent is the provision of a drip tray beneath the evaporator from which the drip or condensate will be discharged through a tube outside the room. Before Babcock's earliest date, mechanical refrigerating units consisting of a motor, compressor and evaporator system had been built as an integral portable structure which could be set into the opening of a wall of an ordinary domestic refrigerator, with the "hot side" outside of the refrigerator wall and the "cold side" or evaporator within the refrigerator body.

The district court in its findings cites and describes numerous prior art patents showing that prior to Babcock's conception date it had been common practice to mount various ventilating, heating and cooling devices on window sills. There is no occasion to burden this opin-

ion with the citation or discussion of more than a few of these prior art patents because the findings relative thereto are not in dispute. Plaintiff, however, asserts that they do not involve refrigerating apparatus which would cool and dehumidify a room. Among the prior art patents described and relied upon by the district court are Kramer Patent No. 1,706,852, applied for February 7, 1918, issued March 26, 1929; Melcher Patent No. 1,825,808, applied for September 2, 1930, issued October 6, 1931 (the first Melcher patent), and Melcher Patent No. 1,921,257, applied for July 18, 1931, issued August 8, 1933 (the second Melcher patent).

■ This appears an appropriate point to refer to the great reliance which plaintiff places upon the unquestioned legal principle that all the claims of a patent are presumed to be valid and that the burden of establishing invalidity rests on the party asserting it. Plaintiff in its brief states and re-states this fundamental principle; "The presumption of validity is greatly enhanced by reason of the consideration thus given by the Patent Office to the principal are relied upon by the defense"; "These applications received an exceptionally thorough examination in the Patent Office," and "To all intents and purposes, defendant's reliance on prior patents and publications as invalidating Babcock's claims consists of an attempt to persuade this Court to overrule the Patent Office." Plaintiff goes so far as to state, "The District Judge failed to give effect to any presumption of validity." This is a gratuitous assertion. It would be more accurate to conclude that the District Judge gave due consideration to the presumption and decided it had been overcome, as has been done by Judges in countless other patent cases.

■ Plaintiff's argument in effect would have us hold that the presumption acquired a stature which renders it irrefutable. We are not impressed with this argument. It is true that Babcock pursued a long and tortuous course in the Patent Office. It was fourteen years after the original application was filed that the claims were finally allowed. Sixty-eight prior art patents were cited and eight interferences considered. The fact that fourteen years were required to persuade the Patent Office to allow the claims might indicate doubt as to their validity. See Coltman v. Colgate-Palmolive-Peet Co., 7 Cir., 104 F.2d 508, 517. In any event, the matter which we next discuss shows that the meticulous scrutiny theory is little more than a figment of the imagination.

The district court found:

"July 25, 1950, before this action was commenced, plaintiff disclaimed claims 6, 7, 9, 11, 12, 13, 16, 21, 27, 31, and 32 of the Babcock patent stating that ' * * * it has reason to believe that through inadvertence * * * the specification and claim of said Letters Patent include that of which said patentee was not the first inventor.' "

■ This disclaimer was based upon 35 U.S.C.1946 Ed. Sec. 65,[1] which authorizes, with certain limitations not here material, a disclaimer of claims allowed "through inadvertence, accident, or mistake." Defendant argues that by thus disclaiming plaintiff admitted the invalidity of the patent and its unenforceability against defendant's structure. No case is cited in support of this contention and we do not think it is the law. In fact, plaintiff cites cases which appear to support a contrary rule. Dunbar v. Meyers, 94 U.S. 187, 194, 24 L.Ed. 34; Smith, Kline & French Laboratories v. Clark & Clark, D.C., 62 F.Supp. 971, 986 (modified by the court of appeals on other grounds, 3 Cir., 157 F.2d 725). Neither will we go as far as defendant would have us do and hold that the disclaimer action entirely destroyed the presumption of validity as to the remaining claims. We do think, however, that it materially detracts from the weight to be attached to such presumption and ne-

1. Now 35 U.S.C.A. § 253.

gates plaintiff's argument of an enhanced presumption arising from the careful and meticulous scrutiny exercised by the Patent Office. The presumption of validity, whether it be characterized as ordinary or enhanced, attached with equal force to all of the thirty-eight claims included in the patent at the time of its issuance. Some five years later plaintiff by its disclaimer admitted that Babcock was not the inventor of eleven of the allowed claims. This means that those claims were invalid from the beginning and that they never should have been endowed with any presumption of validity. The most that can be said for the remaining claims is that they carry no more than the ordinary presumption. (In this connection see our later discussion as to claims cancelled by the applicant in the course of the Patent Office proceeding.)

We now return to the prior art patents. All of these patents were before the Patent Office during the long period in which the Babcock claims were under consideration, except the second Melcher patent which was not cited. It is not readily discernible what there is about the Babcock disclosure which elevated it to a patentable status. The district court found:

"Babcock's contribution was that he took an integral mechanical refrigeration unit mounted on a common base and so arranged the parts that the unit could be placed on a window sill with a drip pan under the evaporator and a tube connected thereto to carry the drip outside of the room. While the Babcock patent shows a casing in the shape of an inverted L or U which sits astride the window sill, the commercial devices that have gone into use and those here accused seem all to be in more or less rectangular cabinets which are mounted on brackets by which they are secured to the window opening of a room."

We see no reason to renounce this finding, notwithstanding plaintiff's insistence that we do so. Of the prior art patents, Kramer and the two issued to Melcher are, in our view the most pertinent. Kramer in his specifications states:

"This invention relates to certain improvements in apparatus for use in cooling rooms or apartments, and for abstracting moisture from the air to reduce the humidity thereof, thereby giving the effect of coolness."

He shows a window air conditioning unit mounted high in a window and containing a hot side comprising a compressor and condenser, together with a fan used to pull air from the room over the hot side, to cool it and discharge this heated air. Kramer shows a cold side partitioned off from the hot side, with a fan adapted to move air over the cold side to cool it within the room. He shows a tray and a tube as a disposal means for condensate. There is no question but that he shows the conventional unitary refrigerating machine used to condition air in rooms. The essential difference between Kramer and Babcock is that the former mounted his unit at the top of a window opening while the latter mounted his unit astride the window sill.

There is testimony that Kramer made no impression on the air conditioning art. The Kramer patent was assigned to Frigidaire Corporation, and a witness for defendant testified that he had never seen or known of a device made in accordance with Kramer. From this situation plaintiff argues that the difference between Kramer and Babcock was the difference between failure and success. We think in making this argument plaintiff is on tenuous ground because the same argument can be made as to Babcock. The patent in suit was assigned to plaintiff, who has never placed a structure made according to Babcock in commercial use. So far as the record discloses, a single structure purporting to represent Babcock was made for the purpose of the instant suit. Neither has plaintiff issued a single license under the Babcock patent alone. The patent was on several occasions included among oth-

er patents owned by plaintiff and licenses issued for the group. However, even in such instances, the licenses provided only for the nominal royalty of 10¢ per unit and most of the substantial manufacturers of air conditioning units refused or failed to take licenses from plaintiff. The fact is that by the time Babcock issued, and its teachings became available to the public, the air conditioning industry had made great progress without any aid from Babcock.

More important, however, even than Kramer are the two Melcher patents disclosing a unitary portable mechanical refrigeration apparatus for use as an air conditioner in a railway car. The first Melcher patent was cited in the Patent Office while the second was not. For this reason, and from the further fact that the second Melcher patent represents an improvement over the first, only the second need be considered. As to this patent, the district court found:

"It shows an air conditioner which was an improvement on the unit of the earlier patent, employing the same basic components, although of a more refined nature, with special provisions to feed fresh air over the evaporator and into the car and to recirculate air from the car through the evaporator chamber. It also had specific provision of a drip tray and tube designed to collect the condensate from the evaporator plate and to conduct it out of the unit. Neither this patent, nor the application from which it matured, was cited against the Babcock application. Melcher shows an evaporator or 'expansion coil' (the cold side), a tray or basin to catch the drippings from the evaporator, a drain pipe to conduct the condensate or drippings outside the unit, through the hot side, and a fan to draw in outside air, pass it over the evaporator, and discharge it into the car. For the hot side of the equipment, Melcher shows a compressor, a condenser, and a fan to draw in outside air past the condenser and compressor to keep them cool. The hot side is separated from the cold side or evaporator by a sealed partition or wall.

"Babcock does nothing that Melcher has not done prior to Babcock. Both condition and recirculate room air. Both are self-contained portable units. Both have mechanical refrigeration units. Both mount the cold side for communication with the air of the room and use a fan to circulate room air. Both mount the hot side for communication with the outside air and use a fan to circulate outside air. Both separate the cold side from the hot side by a partition. Both admit fresh air from outside for mixing with inside air. Both collect the condensate on a tray in the cold side and conduct it outside through the hot side of the unit."

The parties stipulated that air conditioning units as described in the second Melcher patent were manufactured for and installed in a car of the Chicago and North Western Railway Company between April 7 and June 10, 1931. These units were tested and found satisfactory for its purpose before August 8, 1931, and remained on the car until its retirement in 1945. Thus, the use of the Melcher equipment was prior to Babcock's conception date.

It is plain that Melcher shows an evaporator, plus a fan for moving air out of a railroad car, over the evaporator and back in the car at reduced temperature and humidity. It shows a plate-type valve through which fresh air may be introduced into the stream of air which is drawn across the evaporator and into the car. He shows a compressor-condenser, or hot side, which is exposed to outside air for cooling. He shows a drip pan and a drain pipe which extends from the cold side compartment through the hot side compartment as a means for discharging the condensate.

Plaintiff of necessity makes a strenuous effort to demonstrate that the findings with reference to Melcher are clear·

ly erroneous. We are not convinced. It appears clear that Melcher serves the same purpose in substantially the same manner in relation to a railroad car as Babcock does in relation to a room. Of course, as pointed out, the Melcher unit for obvious reasons is installed in the floor of a car and an opening must be cut for that purpose. In contrast, Babcock's unit is installed on a window sill in an existing opening. Plaintiff argues that Melcher's unit is not portable. That is not correct. The most that can be said is that it is not as readily portable as Babcock. This is due to its location, which makes it more difficult to detach and move from one place to another. In any event, any difference in this respect is a matter only of degree.

Plaintiff also attempts to distinguish the two units on the basis that Melcher was not confronted with the problem of disposing of condensate from within the room, inasmuch as his unit was located beneath the floor of the car. Certainly the installation on a window sill of a unit which had been shown and used in the floor of a railroad car did not constitute patentable invention. Furthermore, if such installation created the problem of disposing of condensate from within a room, its solution, so we think, was clearly within the domain of the skilled worker. The proceedings in the Patent Office furnish support for this conclusion. On December 19, 1933, Babcock cancelled claims 13 and 14, with the following statement, "Claims 13 and 14 have been cancelled in view of Melcher." Notwithstanding this voluntary action by Babcock, claims 29 and 30, now in suit, were allowed and are indistinguishable over the original cancelled claims. As typical, we think it worth while to set forth application claim 13 and patent claim 29. They are as follows:

| "Application Claim 13 (Cancelled on Melcher) | "Patent Claim 29 (In Suit) |
|---|---|
| The combination with a window and window frame of a building | In combination with a window casing, |
| of a refrigerating device, | a self-contained, unitary room air conditioning device |
| including a casing mounted within the window frame enclosure in engaging relation with the window, | including a casing mounted upon said window casing, |
| an insulating partition within the casing, | an insulating partition in said casing, |
| an evaporator mounted in said casing on one side of said partition, | an evaporator mounted in the casing on one side of said partition, |
| heat discharging means mounted in said casing on the opposite side of said partition, | air cooled heat discharging means mounted on the other side of said partition, |
| an air passageway from one side of said partition to the other, | an air passageway through said partition, |
| and means for causing the flow of air through said passageway and over said evaporator." | and means for causing outside fresh air to flow through said passageway and over a portion of said evaporator." |

The structures described in the claim cancelled and that allowed appear to be identical. Even the difference in phraseology is slight. We are not able to under-

stand how claim 29 could have been allowed in view of Babcock's cancellation of original claim 13 for the reason stated.

Plaintiff argues that cancellation of these claims during prosecution had no effect upon claims allowed. Two cases are cited in support of this contention. Smith v. Snow, 294 U.S. 1, 16, 55 S.Ct. 279, 79 L.Ed. 721, and Westinghouse Electric & Mfg. Co. v. Condit Electrical Mfg. Co., 2 Cir., 194 F. 427, 430. In both of those cases the court was speaking of rejected claims which obviously are those denied by action of the Patent Office. In the instant situation, however, the claims were cancelled by the voluntary action of the applicant, which we assume he had a right to do either with or without reason. However, he stated that the claims were being cancelled "in view of Melcher." No case is cited and we find none on the point, but we see no reason why this admission by Babcock should not be held against him. While this admission in itself would not invalidate the patent, it would cast serious doubt on the validity of claims indistinguishable from those to which the admission was made. More than that, this is another circumstance which detracts from the contention relative to the meticulous care which was exercised in the Patent Office.

▇ The district court concluded, among other things, that the patent in suit is invalid as anticipated by the second Melcher patent. With this conclusion we agree.

In view of the conclusion just stated, there is no compelling reason why we should proceed further. Even so, we think we should not leave unnoticed the defense that Babcock was anticipated by the prior construction and use of window mounted air conditioning units by Ward Thorne of Chicago. Much oral testimony was heard by the trial court on this issue, and documentary evidence was introduced in support thereof. In June 1932, the Thorne window sill mounted room cooler was advertised for sale to dealers and the public, and the internal structure was shown in printed litera-

ture. Thorne filed a patent application on his unit but, due to the depression, abandoned the commercial manufacture and sale of his unit and likewise abandoned the patent application.

It is hardly open to question but that Thorne was the first to make a public disclosure of such an air conditioning unit. The crucial question is whether Thorne conceived and reduced to practice his unit prior to August 26, 1931, the date of Babcock's conception. On this issue the district court made rather extensive findings and decided adversely to Babcock. The court found [174 F.Supp. 809].

"Testimony was introduced to prove that Ward Thorne, of Chicago, Illinois, produced, tested and demonstrated to others a window-mounted air conditioner during the spring of 1931; that his unit as tested on a window sill, contained all of the usual components of a mechanical refrigeration apparatus; and that it antedated Babcock's conception date by several months. Plaintiff questioned the credibility of witnesses who were testifying to events of more than twenty-three years past and argued that inconsistencies in some details rendered such testimony unreliable. However, the Court, having observed the witnesses and having weighed the supporting evidence for their testimony, finds it worthy of credibility and finds that Thorne's conditioner did antedate Babcock's conception date."

▇ We need only briefly relate the documentary proof relied upon by the defendant and embodied in the findings of the court. In the issue of Electric Refrigeration News dated June 15, 1932, an advertisement appeared which showed Thorne's window sill mounted air conditioning unit. In June 1932, a large, colored brochure was published which described the unit and gave the list price. On May 12, 1932, Ward Thorne entered into a contract for the purchase of compressor units to be used in the manufacture of his conditioner. On March 17, 1932, Thorne filed an application for

patent on a Refrigerated Window Ventilator Unit. He had authorized the preparation of this application as early as October 31, 1931, and his patent attorneys had caused a preliminary search to be made on this device. The search was reported from Washington associates on October 7, 1931. Witnesses testified that the Thorne room cooler had been constructed and tested prior to the manufacture of a refrigerated truck by Thorne which was shown in the Ice Cream Journal in its issue of October 1931.

It must be noted that this documentary proof standing alone carries back the date of Thorne's conception only to October 7, 1931. Babcock's date of conception was August 26, 1931. The district court reasoned, however, that this documentary proof supported oral testimony that Thorne's date of conception antedated that of Babcock. The court, after reviewing the documentary proof, stated in its findings:

"Documentation back to the date of October 7, 1931, supports testimony that the actual construction and testing of the device had preceded that date by some period of time."

Thorne and Vickers testified that they constructed the first window sill air conditioner in the spring of 1931. This testimony the court found to be credible. Even though the documentary proof standing alone did not carry Thorne's date of conception beyond Babcock's, we think it furnished support to the oral testimony in that respect. Of course, the degree of support attributable to such documentary evidence would depend upon the circumstances of the case. Surely documentary proof that the construction of a building was completed on a certain date would furnish support for oral testimony that its construction was commenced some time prior thereto. The degree of support would depend upon the remoteness of the date when it was claimed construction commenced, upon the size and character of the building, and perhaps other circumstances. In the instant case, we think the degree of

support attributable to the documentary proof was a matter to be determined by the trial court.

Plaintiff emphasizes the rule that the defense of anticipation or prior invention must be proven beyond a reasonable doubt. We need not cite or discuss the many cases relied upon by plaintiff because the rule with supporting cases was announced in a recent decision of this court. Pleatmaster, Inc. v. J. L. Golding Mfg. Co., 7 Cir., 240 F.2d 894, 898. Plaintiff, ignoring any support from the documentary proof, also relies upon cases which have held that recollection testimony is rarely, if ever, sufficient to prove anticipation or prior invention beyond a reasonable doubt.

Plaintiff does not dispute but that there was proof of prior conception by Thorne but insists that it was not sufficient to establish that fact beyond a reasonable doubt and that this raises a question of law reviewable by this court. In support of this position, two cases of this court are cited, Pleatmaster, Inc. v. J. L. Golding Mfg. Co., supra, and Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794. Those cases furnish little, if any, support for plaintiff's contention. In each, prior art patents were in the main relied upon to invalidate, and this court thought it was in as good a position to evaluate those patents as was the district court.

■ In the absence of persuasive authority, we are not prepared to hold that the question as to whether the proof establishes prior use beyond a reasonable doubt is one of law. Reason and logic indicate to the contrary. We do not see why the rule in a patent case should be different from any other. In a jury case, whether criminal or civil, the question as to whether there is evidence to take the case to the jury is one of law. However, the proof being sufficient in that respect, the finding of the jury, absent prejudicial error, is controlling. The case having been properly submitted, the question as to whether the verdict is supported by a preponderance of the evidence in a civil case, or beyond a reason-

able doubt in a criminal case, does not raise an issue of law for a reviewing court. To hold otherwise would permit a defeated litigant a trial *de novo* in the court of review on questions involving factual matters.

Plaintiff goes so far as to state that the district court ignored the rule which required proof of prior use beyond a reasonable doubt. We agree that the application of incorrect criteria of law to the evidentiary facts is reviewable on appeal as a matter of law. See Noble Co. v. C. S. Johnson Co., 7 Cir., 241 F.2d 469, 475. The fallacy of plaintiff's position, however, is that there is nothing in the record to indicate or lead us even to suspect but that the trial court applied the correct rule of law and was satisfied that the proof showed beyond a reasonable doubt prior conception and use by Thorne.

Plaintiff in its brief, without record support, states, "The findings demonstrate that the trial court proceeded on a mistaken view of the law. Nowhere was the test of proof beyond a reasonable doubt applied to the evidence." We can only assume that this statement is based upon the fact that the court in its findings failed to incorporate the rule of law as to the degree of proof necessary on the issue of prior use. Such an inclusion was not necessary, in fact, would have been improper. There is no room for doubt but that the court was familiar with the rule under discussion and, as the fact finder, was convinced by the degree of proof required that Babcock was anticipated by Thorne. More than that, assuming that the scope of review is as broad as contended for by plaintiff, we find no reason to disagree with the district court either in his findings or conclusions.

Other issues argued need not be stated or discussed. Obviously, there can be no infringement of an invalid patent and there is no occasion to consider that issue.

The order appealed from is
Affirmed.